**UNITED STATES of America,
Plaintiff-Counterdefendant-Appellee,**

v.

**Helen PAPPAS,
Defendant-Counterclaimant-Appellant.**

No. 85–4179.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 1987.

Decided April 13, 1987.

John R. Goodell, Pocatello, Idaho, for the appellant.

Dirk D. Snel, Boise, Idaho, for the appellee.

Before WRIGHT, FARRIS and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Pappas appeals from judgment quieting title in the United States to lands omitted from an original government survey. The plat prepared from the survey indicates that Pappas's land borders on the Snake River. Because the judgment does not provide Pappas riverfront, we reverse.

### Background

In 1955, the Government conveyed Lot 2 to Pappas. The patent described Lot 2 as

. . . . .

Sec. 22, Lot 2.
The area described contains 39.75 acres, according to the official plat of the survey of the said land, on file in the Bureau of Land Management.

The official plat ("the 1874 plat") was prepared by the Government based on John B. David's 1874 survey. Lot 2 lies in the southeast corner of the northwest quarter-section of section 22, Township 10 South, Range 24 East Boise Meridian, in Cassia County, Idaho.

The Snake River runs through the northwest quartersection on a course roughly northeast to southwest. Because David mistakenly located the left bank of the River southeast of the actual river bank, the 1874 plat omitted a strip of land between the actual bank and the record meander line.[1] According to the erroneous meander line, the River "cut off" one quarter acre from the northwest corner of Lot

2. Had David correctly meandered the river bank, Lot 2 would have been a 40 acre square of land with no riverfront.

In 1956, Pappas erected a fence separating her land from Lot 1, to the north. The Government owns Lot 1. In 1979, the Government sued Pappas for trespass and asked the court to quiet title to several acres of land south of Pappas's fence. Pappas counterclaimed for trespass and sought title to lands north of her fence. The Government did not resurvey the area for the purpose of establishing boundaries until 1980.

### Jurisdiction and Standard of Review

The district court had jurisdiction under 28 U.S.C. § 1345. We have jurisdiction under 28 U.S.C. § 1291. The proper method for allocating omitted lands is a question of law which we review *de novo*. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).[2]

### Discussion

Given that Lot 2 cannot be 39.75 acres and have frontage on the Snake River, we must redesign the boundary between Lots 1 and 2.[3] The following principles guide our decision:

First, where a patent defines land by reference to an official plat, the plat becomes part of the instrument of conveyance. *Snake River Ranch v. United States*, 542 F.2d 555, 556 (10th Cir.1976).

Second, natural boundaries, such as rivers, described in conveyances take prece-

---

**1.** A meander line represents the approximate location of a body of water. Because the Snake River runs through the northwest quartersection, it was necessary to survey the river bank in order to calculate the acreage of subdivided lots.

**2.** "Location" of legal boundaries involves both legal and factual issues. The proper method for apportioning land is a question of law which we review *de novo*. *See McConney*, 728 F.2d at 1201.

By contrast, "[t]he questions where the line run by a survey lies on the ground, and whether any particular tract is on one side or the other side of that line, are questions of fact [which] will be accepted ... unless clear error is shown." *United States v. State Investment Co.*,

264 U.S. 206, 211, 44 S.Ct. 289, 290, 68 L.Ed. 639 (1924) (citation omitted).

The parties to this action do not dispute any of the underlying facts, but rather dispute the method by which the district court located the boundary.

**3.** We are free to do so because no true boundary has been established. One cannot gain title to land of the United States through adverse possession. 28 U.S.C. § 2409a(g); *Sweeten v. United States*, 684 F.2d 679, 682 (10th Cir.1982). Similarly, no title to public lands can be obtained through the Government's acquiescence. *Sweeten*, 684 F.2d at 682.

dence over computations of acreage. *United States v. State Investment Co.,* 264 U.S. 206, 211, 44 S.Ct. 289, 290, 68 L.Ed. 639 (1924); *Snake River Ranch,* 542 F.2d at 557.

Third, surveyors establish meander lines only to calculate acreage, not to establish boundaries. *United States v. Ruby Co.,* 588 F.2d 697, 700 (9th Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

Finally, where a plat depicts the boundary of a parcel as the water line, "the patentee takes title up to the actual water line, even though the survey on which the patent is based inaccurately depicts the position of the river." *Ruby,* 588 F.2d at 700, *citing Producers Oil Co. v. Hanzen,* 238 U.S. 325, 339, 35 S.Ct. 755, 760, 59 L.Ed. 1330 (1915); *Horne v. Smith,* 159 U.S. 40, 42, 15 S.Ct. 988, 989, 40 L.Ed. 68 (1895).[4]

In this case, the 1874 plat depicts the northwest corner of Lot 2 as bordering on the Snake River. The boundary between lots 1 and 2 must be drawn so that Lot 2 includes riverfront.

The proper method for allocating omitted lands between the Government and a private party has not been established in this Circuit. The Supreme Court has stated that frontage on new lands created by accretion is to be apportioned in the same ratio as the frontage along the old meander line, subject to variation where local conditions prevail and the variation is not of great width or extent. *Johnston v. Jones,* 66 U.S. (1 Black) 209, 222–23, 17 L.Ed. 117 (1861) (dicta). The Bureau of Land Management's *Manual Of Instructions For The Survey Of The Public Lands Of The United States, 1973* applies *Johnston's* method of equitable apportionment to lands erroneously omitted from survey. *Id.* Section 7–94 (pp. 178–79).

The problem of allocating omitted lands does not differ materially from that of allocating lands created by accretion. We hold that the *Johnston* rule of "equitable apportionment" applies to omitted lands, unless the omission is so gross and palpable as to constitute a fraud on the Government. *See supra* n. 4. Apportionment, however, must not depend on the riverfront, past or present, of lands not before the court. We will not apportion omitted lands on the assumption that boundaries not within our jurisdiction are subject to adjustment.

*The District Court Decision*

The district court correctly determined that Lot 2 was entitled to riverfront and that equitable apportionment was the appropriate method for allocating the omitted lands. The court erred in including lands currently occupied by Lot 3, owned by a non-party, in the calculation of the amount of riverfront to which Lot 1 is entitled.

The district court based its decision in part on the Government's proposal. The Government suggested that Lot 2 be a 40 acre square parcel with a "goose-neck" corridor running from the northwest corner of Lot 2 to the river. The width of the corridor was to equal the amount of riverfront to which Lot 2 was entitled. The Government apparently calculated shares of riverfront for Lots 1 and 2 according to percentage shares of Lots 1, 2 and 3 on the 1874 plat.[5] The Government calculated Lot 1's new share of riverfront by applying Lot 1's percent share to the actual riverfront occupied by Lots 1, 2 *and 3*.[6]

The location of Lot 2's riverfront depends on the length of Lot 1's riverfront. The Government marked the point at which Lot 1's riverfront ended and Lot 2's river-

---

4. This rule does not apply if the surveyor's omission constituted a "gross and palpable error" amounting to a fraud on the Government. *Jeems Bayou Fishing & Hunting Club v. United States,* 260 U.S. 561, 564, 43 S.Ct. 205, 206, 67 L.Ed. 402 (1923); *Horne v. Smith,* 159 U.S. 40, 15 S.Ct. 988, 40 L.Ed. 68 (1895); *Ruby,* 588 F.2d at 700. Neither party contends that David's omission constituted a gross and palpable error.

5. Thus, if the 1874 plat indicated that Lot 1 had 30 percent of the river frontage, Lot 2 had 20 percent, and Lot 3 had 50 percent, each Lot would have like shares of the actual river front.

6. The actual river front is represented by the meander line on Government's Exhibit 138 (Appendix).

front began with a meander corner located approximately 1457 feet southeast of the corner of fractional sections 15 and 22.

The district court accepted the Government's apportionment of riverfront, but rejected the goose-neck as inconsistent with the rectangular shape of Lot 2 on the 1874 plat. For the boundary between Lots 1 and 2, the district court drew a straight line from the meander corner marking the southern-most extent of Lot 1's riverfront, due east to the eastern boundary of Lots 1 and 2.

*The Extent of Lot 1's Riverfront*

Under the Government's apportionment of riverfront, most, if not all, of the river-

front that Lot 2 would receive is currently occupied by Lot 3. Lot 2 would only obtain an equitable share of riverfront if the boundary between Lots 2 and 3 could be readjusted so that Lot 3 had no more than its original share of riverfront. The owner of Lot 3, a private individual, is not a party to this lawsuit.

In order to assure Lot 2 of its equitable share of riverfront, Lot 2's riverfront must be taken out of lands not currently occupied by Lot 3.[7] The remaining riverfront must be allocated without reference to Lot 3. We determine the extent of Lot 1's riverfront as follows:

$$\text{Lot 1's Riverfront} = \frac{(\text{Lot 1's 1874 Riverfront})}{(\text{Total 1874 Riverfront of Lots 1 and 2})} \times \begin{array}{l}\text{Actual Riverfront} \\ \text{Currently Occupied By} \\ \text{Lots 1 and 2.}\end{array}$$

(These calculations are explained in greater detail in the Appendix.)

*Shape Of The Boundary Line*

■ Allocation of riverfront does not dictate the shape of the boundary between Lots 1 and 2. The 1874 Plat depicts the boundary as a straight line running from the river due east to the eastern boundary of Lots 1 and 2. The record does not reveal any topographic irregularities that would make a straight boundary impractical. Pappas has improved the northern part of Lot 2 substantially since 1956. The Government has erected no permanent structure north of the Pappas fence. Although we could create a corridor from Lot 2 to the river, as the Government suggested at trial, we reject that solution as inconsistent with the design of the 1874 plat.

■ In reaching this conclusion, we note that all equities favor Pappas. Under Idaho law, deeds are strictly construed against the grantor. *Hayes v. Flesher*, 34 Idaho 13, 198 P. 678, 679 (1921). This canon of construction applies to the government patent in this case as well as to private conveyances.[8]

The Government 1) hired the surveyor who misplaced the river, 2) failed to resurvey the land at the time of the conveyance, 3) failed to join the owner of Lot 3 as a party, and 4) failed even to notify the owner of Lot 3 of the pendency of this litigation. Finally, the Government instituted this lawsuit.

*Conclusion*

Lot 2 is entitled to its share of riverfront based on the 1874 plat. Riverfront not

---

7. The boundary between Lots 2 and 3 may have become fixed through adverse possession.

8. Construction of federal patents is a question of federal law. *United States v. Oregon*, 295 U.S. 1, 28, 55 S.Ct. 610, 621, 79 L.Ed. 1267 (1935). Unless Congress expresses a contrary intention, federal patents will be construed according to the law of the state in which the land lies. *Brewer-Elliott Oil & Gas Co. v. United States*, 260 U.S. 77, 88, 43 S.Ct. 60, 64, 67 L.Ed. 140 (1922); *see also Oklahoma v. Texas*, 258

U.S. 574, 594–95, 42 S.Ct. 406, 414, 66 L.Ed. 771 (1922). Because the patent conveying Lot 2 to Pappas does not state that federal law governs, we construe the patent in accordance with Idaho law.

By contrast, the method by which omitted lands are apportioned is a federal question, distinct from interpretation of the patent itself. Accordingly, we look to federal law in order to allocate omitted lands.

currently occupied by Lot 3 shall be equitably apportioned according to the relative shares of Lots 1 and 2 on the 1874 plat. Where the original plat is erroneous, corrected boundaries should reflect as nearly as possible the design of the original plat, unless equity or topography dictate otherwise.

The boundary between Lots 1 and 2 shall run from the southern-most point of Lot 1's adjusted river front (*see* Appendix for precise description) due east to the eastern boundary of Lots 1 and 2. Any encroaching structure shall be removed within 150 days of the filing of this opinion, unless otherwise agreed by the parties.[9] Each party shall bear its own costs.

REVERSED.

APPENDIX

According to the Court's calculations, Lot 1 is entitled to 88.2% of the riverfront bordering on Lots 1 and 2 on the 1874 plat. Lot 2 is entitled to the remaining 11.8%. These percentages are based entirely on the 1874 plat and David's field notes.

Carper's 1985 plat shows a small segment of fence running from the western end of the "existing fence" separating lots 1 and 2, north to the new meander line. The Record contains references to a fence separating lots 2 and 3, running north to the river. [CR 89, p. 353; CR 77 (Affidavit of Tim Darrington, (Owner of Lot 3)). We assume that the fence segment on the 1985 plat is part of the fence that currently separates Lot 2 from Lot 3.

We further assume that this fence intersects the new meander line at a point 1317.1 feet due west of the eastern boundary of lots 1 and 2.[10]

The riverfront within this Court's jurisdiction lies between the point where the fence dividing lots 2 and 3 meets the river and the corner of fractional sections 15 and 22. The length of this riverfront is approximately 1297 feet. Lot 1 is entitled to 88.2%, or 1144 feet of riverfront.

The boundary between lots 1 and 2 shall run from a point on the new meander line 1144 feet southwest of the corner of fractional sections 15 and 22, due east (S 90° 00'00"E) to the eastern boundary of lots 1 and 2.

**9.** Pappas's fence encroaches approximately 51 feet upon Lot 1 at the eastern boundary of Lots 1 and 2. We reject Pappas's claim that the government is estopped from complaining about the location of the fence. Pappas claims that Bureau of Reclamation employees told Pappas where to locate her fence. The district court properly excluded Pappas's testimony and the memorandum of Short's conversation with Tillery as inadmissible hearsay.

Even if the evidence were admissible, the evidence could not establish that the Government knew the true location of the boundary between Lots 1 and 2. To be estopped, a party must know the true facts of which the relying party is ignorant. *See Ruby,* 588 F.2d at 703; *United States v. Wharton,* 514 F.2d 406, 412 (9th Cir. 1975). Because of David's error, there was no "true" boundary between Lots 1 and 2.

**10.** The fence appears to veer somewhat west of due north. Because the record does not indicate the course of the fence, we shall assume that the fence runs due north, in order to assure Lot 2 of its full share of riverfront.

APPENDIX—Continued

Plaintiff's Exhibit 23

1874 Plat of Township 10 South
Range 24 East Boise Meridian
(Enlarged; this is not the entire plat)

Northwest Quarter,
Section 22

APPENDIX—Continued

# SECTION 22, TOWNSHIP 10 SOUTH, RANGE 24
## Cassia County, Idaho.
### 1985

Government Exhibit 138 (detail)

APPENDIX--Continued

Detail of Exhibit 138
(Revised)

*Meander Corner*
*Fractional Sections*
*15 and 22*

490.36'
N 90°00'00" W

1144'
Meander Line S 39°35'48" W

*U.S. Government*
*Lot 1*

N 0°16'14" W
1316.52'

*Snake River*
*Direction of Flow*

453'

Ninth Circuit Line

Existing Fence

District Court Line

(Upper Boundary) Gov't's Proposed Gooseneck
136.1'   ← 1181.0' →

*Lot 3*

*Record Boundary Line*

*Pappas*
*Lot 2*

WEST KEY NUMBER SYSTEM